Good morning, Your Honors. I'm Daniel Spurgeon on behalf of Samson Tug and Barge. I'd like to reserve seven minutes for rebuttal, please. This case is even more interesting than the one about windows. Here we're talking about tugboats, barges. So what this case boils down to are two fairly simple legal principles. The first is that a party to a contract cannot enforce its own contract terms against a stranger. There is no quasi-governmental eminent domain power that a private party gains when it forms a contract with one other business partner. The second overarching legal principle is that when Congress has clearly spoken to an issue with statutory text, that language must control unless there is some superseding constitutional provision. Let's get away from generalities. Can you discuss the work preservation issue, please? Yes, Your Honor. The cases that are cited on work preservation all speak to one of two contexts. The first, such as in ILA-2, is a situation where an employer has agreed to a work jurisdiction term with a labor organization. And, of course, when you're a party to a contract, and you agree that no matter which technology develops or which geographic location, you're going to have this work ongoing with your workforce, that you will recognize the jurisdiction of a certain union. That's an unremarkable proposition. However, here, Samson Tug has never entered into any contracts with the ILWU. It has never been signatory to the AALA agreement. But the new owner of the port is a signatory, correct? Yes, Your Honor. Strictly in a landlord-tenant capacity. And many of the cases that have been cited in the briefing so far by ILWU speak to a contractor-subcontractor relationship. And that was not present here. Mattson, not only did they not subcontract any work to Samson Tug, they never performed any work with their own forces at the Lash Dock. So all of those cases that speak to a contractual agreement of work jurisdictions, such as ILA-2, are entirely an opposite. The other type of case that falls under the work preservation defense are the ones where the containers are owned by the employer against whom the union is affecting coercion. So that would be like the Cal Carthage case. But here, the District Court improperly found that Mattson owned the shipping containers that Samson was transporting. But as counsel to their credit have conceded in the briefing here in the appellate court, that was an error. There is no evidence of any kind of the record that Mattson ever owned the containers that Samson shipped. Mattson never had any equipment at the Lash Dock. And in fact, when Samson, after paying $733,000 for work that was never performed, left the Lash Dock, there was no work performed there. Because Mattson had no forces, no operations, no right to control Samson's work in any way. And as the IWU bears the burden of proof on the work preservation defense, it was their duty in the District Court and here to point to record evidence to show that A, they have been performing the work in question, and B, that the employer against whom they were affecting coercion had the right to control the work of the neutral, which is Samson. And neither one of those are satisfied on the record here. When it comes to the question of whether the union has shown that they have historically performed the work in question, the trend is for the union to brief this broad regional sort of a claim that because the Longshoremen perform work at various ports throughout Alaska. Well, it isn't quite that generic. I think the agreement in question obliges Mattson to have ILWU Longshoremen performing all the cargo handling at the ports that Mattson owns. Doesn't the agreement require that? That was the Cagle interpretation, Your Honor, and that's an illegal 8E hot cargo interpretation. And under this Court's APL precedent, I believe in 2013, that's an unenforceable hot cargo interpretation. I think that's what the agreement says. I don't think it's an interpretation of the agreement. Well, Your Honor, even if the plain text... Excuse me. Sorry. Give you an extra few seconds. I interrupted you. Even if the plain text of the agreement said that, that doesn't affect Samson because Samson never signed on to that agreement in any way. And if... But that's not the question, is it? Isn't the question whether the union was permissibly pursuing a work preservation objective? Your Honor, there was no work for them to preserve. They never perform work at the Lash Dock. They got paid $733,000 for phantom work, but they never performed any work there. Mattson never performed any work there at all. Mattson's the owner, right? Yes, Your Honor. Strictly the landlord. Well, that's my problem because I read the agreement to require any signatory to use the union, the ILWU, in any port that it owns, any facility that it owns. And Your Honor, if Mattson had operations there with Mattson employees, Mattson would have agreed to use ILWU labor. Well, you're struggling with how I read the agreement because if as an owner they're required to see to it that that is the union that performs the work, then it seems to me that there's a legitimate argument there because your argument really is that there's no legitimate assertion of work preservation. Well, I have two responses to that, Your Honor. The agreement would not affect Sampson because Sampson never signed on to it, but when the union deliberately targeted Sampson by way of coercing Mattson, it directly violated the congressional statute in AE and that cannot Coercion here, so-called coercion, is starting the arbitration, is grieving the arbitration. So the arbitrators agreed with them, and I know that isn't the be-all and end-all because the court could find that that was illegitimate nevertheless, but it is suggestive of a work preservation motive. Well, Your Honor, if ILWU's motivation was actually only targeted at Sampson, or only there, at the direct impact on Mattson, then we would have an entirely different case. However, in the record, such as 5 ER 561, 661 through 668, there is ample written evidence that ILWU was expressly targeting Sampson Tugg. It was applying coercion to Mattson with the specific intent to injure Sampson. ILWU wanted Sampson Tugg to pay these time and lieu charges under the Terminal Services Agreement, and that's why ILWU cannot point to any case on all fours that relates to a situation where the neutral Sampson is being penalized and essentially pushed out of business at a location, all because they employ members of MEBA instead of members of the union that's affecting the coercion. You said you wanted to reserve seven minutes. Do you want to reserve? I'll reserve the remainder, Your Honor. Very well. Good morning, Your Honors. Emily Mollio for the police, ILWU Alaska. Could you speak up also? Oh, sure. Sorry. Can you hear me? Yes. Okay. To start, I just want to note, this Court need only affirm summary judgment on any one of three separate grounds, the union's work preservation defense, the union's neutrality defense, or that Sampson failed to prove that or failed to submit evidence that the ILWU's actions caused its damages. Now, turning to the work preservation defense that counsel was discussing, first, in virtually every work preservation case, lawful work preservation case, the union seeking work preservation is seeking it, work that's not currently assigned to that, to them. That is the case in National Woodwork at 615 to 16. The party who was alleging a violation of the law was the contractor of a union's employer. That's the case in the ILA cases. The charging parties there were affected truckers and consolidators and the Teamsters who were going to lose work as a result of the enforcement of the work preservation agreement. The same in Maui Trucking, non-union truckers. Same in Cal Carthage, consolidators, Teamsters. And in the Fourth Circuit's recent decision, South Carolina Ports Authority, there was the State and the Port Authority who were claiming an injury as a result of the ILA's work preservation agreement. And in that decision, particularly at note four, they note, as I just said, in nearly all work preservation cases, the union seeks work not currently assigned to it. That draws directly from Supreme Court precedent in the ILA cases, which find that you need to focus on the work of the bargaining unit employees, not on other employees. No matter how severe the impact is going to be on other employees, that is irrelevant to the analysis. The extra unit effects of a lawful work preservation agreement alone do not establish an unlawful secondary object. This circuit recently found that as well in the Frito, well, not recently, actually, 1980, found that in the Frito-Lay case. That seems recent to some. Where it says we do not infer intent from foreseeable consequences. And what Samson's counsel cannot point to in the record here is any evidence that my client directed any activity to them. Rather, the impact on Samson and Samson's employees was incidental to a lawful work preservation agreement. Now he also raised the issue of control. And from what I can read in the briefs, it seems like they are trying to apply a stricter level of what the right of control is than what the Supreme Court and what this circuit has held. And on those points, I would refer the Court to the decision, also 1980 decision in Verdugo Bowl. In that case, a bowling alley had a tenant who was a coffee shop. For many years, through its role as the landlord, they were able to require their tenant to sign a union signatory agreement and become a signatory to the union contract. After many years of doing so, they didn't want to do so anymore. That is when they went to the labor board. And I think what is really important here is this Court found that there is little doubt that the bowl, armed with its contract language, is capable of threatening termination of the relationship in order to force its lessee to accede to union demands. The problem in that case was not that the bowling alley didn't have control over the work in dispute, but rather that they were trying to impose what was an unlawful union signatory agreement. In fact, this Court noted that the bowling alley would have been free to impose and require its tenant, through that, the same exact identical authority at issue here, to agree to a union standards clause. Likewise, in 2018, this Court found in Paramount that if Paramount had the authority over the scoring musicians via its contractual control over the composer's selection, then Paramount had the power to give the scoring musicians the work in question. So there really is no dispute here that, by virtue of being the landlord, Mattson had lawful control over the work. I'm happy to discuss some of the other arguments, if Your Honors have any questions on any matters here. I guess I will just further add here on the neutrality defense, which counsel did not raise. From the briefing, I believe what Sampson is contending is that neutrality is limited to the so-called ally doctrine that has been developed over the years. I think it's important to note, though, that that concept derived from basically statements that Senator Taft made when passing the Taft-Hartley Act, which created the secondary boycott laws. That the purpose of those laws are to protect employers wholly unconcerned with the labor dispute and not to protect those who are in cahoots. Here, and this concept kind of came first from a district court decision, endowed, and then the board kind of developed it, but there's never any point where it says there's only two paths, struck work or single employer, that are the only ways that an employer loses the protection of the act. Rather, as the board held in Sid Harvey, that you need to make a realistic common sense evaluation. In many of these cases, they go a bit outside of those two narrow lanes. I think Roslyn Americana is a good example. Here, while it is the case there was no struck work, it is also plainly the case that Sampson was performing work that the Coast Arbitrator directed Mattson to assign to the ILWU. Arbitration is kind of part of the grand bargain. Unions give up their right to strike in exchange for having a third party neutral resolve disputes. The analogy, I think, is pretty close there. I think it's especially the case, if you look at the drafting of the Terminal Services Agreement, how it was entered behind the ILWU's back, how as soon as the ILWU found out about it, we went immediately back to the arbitrator and reached a finding that Mattson violated the arbitration award by entering into that agreement, making contentions that my client wanted Sampson to pay time in lieu pretty preposterous. If your honors have no further questions, or no questions at all, thank you, it was an honor to appear before you. I'd just like to respond to these points that were made in serial order unless the court has questions. The cases such as ILA and the more recent ones that were cited, those all rely on the employer had agreed to a certain term, such as anywhere that we perform work, we will use your labor. But that's not present here. Sampson was never in a contract with ILWU, ILWU has never performed the work at the Blashtok that Sampson was performing, never. And Mattson is the landlord. If they go buy more real property somewhere in Juneau, does everyone who's currently leasing that land in Juneau suddenly have to hire ILWU's labor? I mean, that's a governmental power that ILWU is seeking, essentially a prohibition on any employers not using ILWU labor. And when we hear the term the grand bargain just now, well, sure, if you are contracting with a labor organization, you're bargaining, there's a compromise that's reflected in the National Labor Relations Act, but Sampson chose not to with the ILWU, instead it struck its bargain with MEBA and it has a productive relationship with MEBA, terrific success. Mr. Baggan has been operating a tugboat for his company since he was 13 years old. They're successful, they want to be left alone. Congress wrote statutory text that says you have to leave them alone. If you want to organize them, you have to come in through the bottom-up approach and try and generate interest and votes. We don't need to infer intent here. This isn't where we're just speculating that ILWU was targeting Sampson Tug's work vis-a-vis the coercion on Mattson. I'll point the court to the record at 5 ER 661, 657 through 660, 674 through 675, 682 through 685. ILWU was expressly targeting Sampson, wanted Sampson to pay these time and lieu charges. And then eventually, despite Sampson paying almost a million dollars for work that was performed, then ILWU demanded that Mattson terminate the Terminal Services Agreement and evict Sampson if Sampson wouldn't betray MEBA and hire ILWU labor. And we have the March 5, 2020 email in there where one of the three options that ILWU demands is that Mattson evict Sampson. If that's not a cease-doing business objective that has caused Sampson nearly a million dollars in damages so far, then I don't know what the Congressional text could possibly prohibit. It has to mean something. Verdugo Hills Bowl was a subcontracting case. Mattson never subcontracted anything to Sampson, never had operations at the lash dock. Only Sampson did. A union standards case such as Verdugo Bowl would be minimum safety standards, minimum wages. But there's no evidence that that's ever been an issue in this case. There was no union standards closet issue. Also, we just heard a request that this Court use its power to add exceptions to 8B and 8E and essentially just write more employers out of the protections of the statute because, well, we heard that, well, there shouldn't only be two ways that an employer can lose its neutrality status. Well, if Congress wanted to create exceptions, it would have. It didn't do that here. It made exceptions for the garment industry and the construction industry. It did not choose to do so for the longshoremen industry. And the main point, which I'd like to close with, is that even if some of ILWU's points have been correctly cited to the record, at a minimum, there is a question of disputed fact where Sampson Tugg should get to present its case to the jury in a trial setting. Unless the Court has any questions, I'll conclude with that. All right. Thank you very much, counsel. Thanks to both of you for this, the argument and briefing in this case. This matter is submitted and we are done for the week. I want to thank everyone who made this possible. Thanks to CSOs. Appreciate it. Thanks to our tech folks over there. Have a good weekend.
judges: GRABER, OWENS, NELSON